**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| **ALLEN J. RICHARDS** ) <br> 3146 Winchester Road ) <br> Delaplane, Virginia 20144 ) <br> ) <br>    **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **TOMAS PAPADOPOULOS** ) <br> 20 Deepwood Road ) <br> Roslyn Heights, New York 11577 ) <br> ) <br>    and ) <br> ) <br> **AUTO SPORT DESIGNS, INC.** ) <br> 203 West Hills Road ) <br> Huntingdon Station, New York 11746 ) <br> ) <br>    **Defendants.** ) | Case No. _____ |

**COMPLAINT FOR MONEY DAMAGES**
**AND JURY DEMAND**

COMES NOW Plaintiff Allen J. Richards, and for his Complaint against Defendants Tomas Papadopoulos, and Auto Sport Designs, Inc., respectfully states as follows:

**Parties**

1.     Plaintiff Allen Richards ("Plaintiff," "Mr. Richards") is an adult citizen of Fauquier County, Virginia, residing at 3146 Winchester Road, Delaplane, Virginia 20144.

2.     Defendant Tomas Papadopoulos ("Mr. Papadopoulos") is an adult citizen of Nassau County, New York, residing at 20 Deepwood Road, Roslyn Heights, NY 11577, and is the Chief Executive Officer of Defendant Auto Sport Designs, Inc.

3.      Defendant Auto Sport Designs, Inc. ("Autosport") is a company organized and existing under the laws of New York, and at all relevant times operating with a principal place of business at 203 West Hills Road, Huntingdon Station, New York 11746.

## Jurisdiction and Venue

4.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship, and the amount in controversy exceeds $75,000.00.

5.      Venue in this Court is appropriate under 28 U.S.C. §1391 because the Plaintiff resides in Fauquier County in the Eastern District of Virginia, the fraudulent misrepresentations and inducements were made to the Plaintiff while he was in the Eastern District of Virginia, the loss was suffered in the Eastern District of Virginia, and other primary events and circumstances giving rise to the claims herein occurred in the Eastern District of Virginia.

## Facts

6.      In late October 2009, Mr. Richards purchased a 1975 Aston Martin from Autosport.

7.      In or around November 2009, Mr. Richards purchased a 1980 Aston Martin from Autosport.

8.      In late October 2010, Mr. Richards traded his 1975 Aston Martin to Autosport towards his purchase of a 1989 Aston Martin Volante.

9.      In late March 2013, Mr. Richards purchased a 1984 Renault R5 Turbo from Autosport.

10.     In late May 2016, Mr. Richards traded his 1989 Aston Martin Volante, and paid an additional $66,000.00 to Autosport for a 1934 Lincoln.

11.     As a result of these numerous transactions with the Defendants, Mr. Richards came to trust Mr. Papadopoulos and Autosport.

12.     In late 2016, and since he was not driving his 1980 Aston Martin very much, Mr. Richards looked on Autosport's website to view its inventory. He saw a 1961 Porsche 356B Roadster ("Roadster") listed for $217,500.00 and contacted Mr. Papadopoulos by telephone, from his home in Fauquier County, Virginia, to explore the possibility of a trade that included the 1980 Aston Martin.

13.     During that telephone call, Mr. Papadopoulos told Mr. Richards that:

a.      he would trade the Roadster to him in consideration of the 1980 Aston Martin plus $60,000.00;

b.      that he had bought the Roadster from Fantasy Junction in California for $160,000.00;

c.      that the Roadster was a "*great car*;"

d.      that the Roadster was not "*numbers matching*"[1] but that the Roadster's engine was "*period correct*."[2]

14.     Mr. Papadopoulos also made the following representations in a text message on December 15, 2016: "*...the best I think I can do is the Aston and the 60 grand for the*

---

[1] "Numbers matching" in the context of 356 Porsches means that the engine in the car is the actual engine which was installed in the factory when the car was originally assembled.

[2] "Period correct" in the context of 356 Porsches means that the engine, while not numbers matching (*i.e.*, not the factory-installed engine), is correct for the year of the car (*i.e.*, it is an engine made during the same time period [but not necessarily the same year, so long as the specifications and features were the same] and has the same specifications and features as the original numbers matching engine. In other words, it would differ from the numbers matching engine only with respect to its actual numbering.

*356. And let me know I'd love to do it if you want to do it, but I understand if it's more*

*than you'd like to spend. That said, I think the 356 is worth every penny.*"

15.    Due to Mr. Papadopoulos' marketing and public statements, Mr. Richards was

aware that Mr. Papadopoulos had bought and sold many cars of the same make and model as the

Roadster and was aware of Mr. Papadopoulos' purported expertise with Porsches generally, and

Roadsters specifically.

16.    In late December 2016, Mr. Richards drove up to New York to view the Roadster

and trade in the 1980 Aston Martin. Mr. Richards observed that the front fenders of the Roadster

looked horrible and Mr. Papadopoulos agreed to have them painted.

17.    By Autosport Bill of Sale dated December 19, 2016, followed by an Autosport

Vehicle Invoice dated January 24, 2017, Mr. Richards purchased the Roadster from Autosport.

The consideration paid by Mr. Richards was $195,000, to be comprised of the trade of his 1980

Aston Martin,[3] and the payment of $60,000.00.

18.    The Autosport Vehicle Invoice dated January 24, 2017, which identifies the

Roadster as "USED," includes the following notice:

**Dealer Facility No. 7062282**

**"IF THIS MOTOR VEHICLE IS CLASSIFIED AS A USED MOTOR
VEHICLE DEALER NAMED ABOVE CERTIFIES THAT THE ENTIRE
VEHICLE IS IN CONDITION AND REPAIR TO RENDER UNDER
NORMAL USE, SATISFACTORY AND ADEQUATE SERVICE UPON
THE PUBLIC HIGHWAY AT THE TIME OF DELIVERY."**

---

[3] In the trade-in Autosport assigned $135,000 value for the 1980 Aston Martin. Upon
information and belief, it was apparently subsequently sold by Autosport for around $219,500.00
(*see:* http://www.autosportdesigns.com/inventory/images/1035/aston-martin-v8-oscar-india-
coupe-1980)

19. The New York State Department of Motor Vehicles Retail Certificate of Sale (No. 55049420) (hereinafter the "Retail Certificate") designates the Roadster as "Retail Used."

20. At all relevant times herein, under *N.Y. Veh. & Traf. Law § 415(1)(a)*, Autosport was a "Dealer" as defined therein.

21. At all relevant times herein, under *N.Y. Veh. & Traf. Law § 415(1)(i)*, the Roadster was a "used motor vehicle" as defined therein.

22. In the Odometer Disclosure Statement contained in the Retail Certificate, Defendant Autosport certified that "to the best of [its] knowledge," the 36,346 Odometer Reading "reflects the 'ACTUAL MILEAGE' of the [Roadster]." Autosport made this representation despite knowing that the engine in the Roadster was *not* original to the vehicle, and despite the warning on the face of the Retail Certificate that "not telling the truth about the mileage may result in fines and/or imprisonment."

23. In the "DEALER CERTIFICATION" portion of the Retail Certificate, Autosport certified as follows:

> ***I certify***: The vehicle described above was sold to the purchaser on the date indicated. At the time of delivery the purchaser was entitled to register the vehicle. This vehicle complied with equipment requirements of the Commissioner's Regulations. At the time of delivery, such equipment was in condition and repair to render satisfactory and adequate service on the public roadway under normal use….False statements made herein are punishable as a Class A misdemeanor pursuant to Section 210.45 of the Penal Law.

24. On April 22, 2017, having made payment in full for the Roadster, Mr. Richards picked up the Roadster and trailered it to his home. He took it out of the trailer and placed it in his garage.

25. The very next day, on the morning of April 23, 2017, when Mr. Richards went into the garage where the Roadster was located, he smelled gas and found that the fuel line under

the dash was dry rotted and leaking fuel. Mr. Richards also discovered that the accelerator pedal was loose, and the valve covers were leaking.

26.     Consequently, and in direct contravention of Defendants' certifications and representations, the Roadster was *not* "in condition and repair to render under normal use, satisfactory and adequate service upon the public highway at the time of delivery."

27.     In late July 2017, Mr. Richards contacted Mr. Timothy Berardelli, of Tim Berardelli Racing, to perform maintenance, to fix the Roadster's issues, and to install a full flow oil filter system on the Roadster.

28.     Mr. Richards delivered the Roadster to Mr. Berardelli on July 24, 2017.

29.     During the course of Mr. Berardelli's inspection of the Roadster, he discovered not only that its condition was not roadworthy, but that its engine was also not "period correct," *i.e.*, it was not the specific type of engine that had been represented.  Indeed, it was an inferior, older period engine that had been installed in the Roadster.

30.     The Roadster is a 1961, B Model 356 Roadster with chassis number 88975, making it the 654th Roadster of 1661 that were built during model year 1961.

31.     The Roadster's Engine Number, 604933, is stamped on the third piece of the case or Timing Cover. That number is within the range of numbers for engines that would have been installed in this particular 356 with this type of engine (1600 cc, Normal) during model year 1961.

32.     However, upon inspection, Mr. Berardelli found and has described the following discrepancies in the other vehicle numbers applied to this engine:

> **On the top of the engine, on the second set of case perimeter bolts (left side), is a five-digit number, 34942. This Case Casting Number ("CCN") is applied sequentially to the engine's two main case halves when they receive their final machining at the factory. When compared to other CCNs in known accurate**

6

**databases, CCN 34942 reflects that this case received its final machining in mid- to late 1959. This number could _not_ appear on a Model Year 1961 Porsche 356 engine.**

**On the right top perimeter bolt, adjacent to the CCN location, the factory stamped a "Type" number to reflect the internal components used when the engine was built. During Model Year 1961, a 1600 cc Normal engine would have been stamped 616/1. The Roadster's engine is stamped "1600," a designation not used after Model Year 1960.**

**In addition to discrepancies between the engine, the CCN, and Type numbers found on the Roadster's engine, it is clear that the Engine Number (604933) was applied to the Timing Cover post factory. This is evident because the font used on the Roadster's engine is in total disagreement with fonts that were applied to Timing Covers with known to be genuine factory stamps used during this time period.**

33.     Any Porsche Roadster 356 expert would know that the Engine Number on the engine timing cover had been fraudulently stamped (due to the incorrect font), that the engine case was machined in mid-to-late 1959, and that the engine itself could not have been manufactured any later than 1960.

34.     The engine contained in the Roadster sold to Mr. Richards by Defendants was an inferior, older model engine and not a period correct engine. Genuine period correct, *i.e.* six-digit number (616/1) normal engines included in all 356 engines manufactured by Porsche during Model Year 1961 have larger oil pump gears, with increased gear width, tip diameters, and gear centers. The smaller, earlier era gears, contained in the Roadster's non-period correct engine, pump **59% less oil** (by volume) per revolution of the oil pump gears.

35.     Any Roadster 356 expert would immediately recognize, upon a visual inspection of the Roadster's engine, that it lacks the larger oil pump gears and therefore cannot possibly be "period correct."

36.     Moreover, when Mr. Berardelli went to rotate the Roadster's crank pulley by hand, he noticed that the crank moved in and out about ¼", which is dangerously out of

specification. He instructed Mr. Richards not to start the engine again due to the crankshaft issue.

37.    The Roadster has remained undriveable. Mr. Richards has lost a roadworthy vehicle (the 1980 Aston Martin) and $60,000, and been left with a vehicle he is unable to use in its condition as purchased.

38.    In addition, the vehicle Mr. Richards received from the Defendants was not a 1961 Porsche 356B Roadster with a period correct engine:

      a.    The Roadster sold to Mr. Richards by the Defendants did not contain a "period correct" engine;

      b.    The Roadster sold to Mr. Richards by the Defendants instead contained:

          i.    An inferior, older engine which its Type Numbers show could not have been manufactured in 1961, with smaller oil pump gears, which is significantly less efficient, and significantly less valuable;

          ii.    A fraudulently stamped Timing Cover which sought to represent that the engine was "period correct." The presence of fraudulently stamped engine parts even further impacts the value of the Roadster;

          iii.    A case number which could not appear on a Model Year 1961 Porsche 356 engine, and which dates from mid-to-late 1959.

39.    The undriveable condition of the Roadster, the period incorrect engine, and the fraudulently stamped vehicle numbers (using an incorrect font) would have been obvious to an experienced Porsche dealer and/or mechanic, both of which Mr. Papadopoulos represents himself to be. Pursuant to *N.Y. Veh. & Traf. Law § 421(1)*, as persons engaged in the business of buying or selling motor vehicles, Defendants are "*presumed to have determined and to know the original vehicle identification numbers and special identification numbers on any motor*

*vehicle...purchased or sold by [you], both at the time of purchase and sale.*" Pursuant to *N.Y. Veh. & Traf. Law § 421(4)*, "original identification number" means "*any number embossed, engraved, etched, affixed to a label, sticker or plate or similarly marked on any part of a motor vehicle, trailer or vehicle part which is assigned by the manufacturer for the purpose of identification of that particular motor vehicle, trailer or vehicle part and the location of which number is made available to the public.*"

### Count I
### (Fraud)

40.     The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

41.     Throughout the period from 2009 to 2016, Mr. Richards and Defendants had an ongoing relationship, during which Mr. Richards was exposed to Defendants' representations of expertise in relation to classic cars generally, and Porsches and Porsche Roadsters specifically. Throughout this relationship Mr. Richards reasonably and justifiably relied on Mr. Papadopoulos' (on behalf of Autosport) representations of expertise in relation to these types of cars, and paid significant consideration to the Defendants in reliance on that purported expertise.

42.     In late 2016, Mr. Papadopoulos represented to Mr. Richards on a telephone call that the Roadster was:

      a.     A great car; and,

      b.     A Porsche 1961, B Model 356 Roadster, with a "period correct" engine.

43.     By Vehicle Invoice dated January 24, 2017, Autosport certified that the Roadster was "in condition and repair to render under normal use, satisfactory and adequate service upon the public highway at the time of delivery." Autosport further made the aforesaid representations contained in the Retail Certificate.

44.    The Defendants had a duty to truthfully disclose that the Roadster was not "period correct," and that the Roadster was not in roadworthy condition. Thus, Defendants made false representations to Mr. Richards of these material facts.

45.    At the end of July 2017, Mr. Richards first learned, following an inspection of the Roadster by Mr. Berardelli, that the Roadster's engine was not "period correct," and that the Roadster was not roadworthy. In other words, Defendants fraudulently concealed from Mr. Richards the true facts about the Roadster, which were material to the quality, performance and value of the Roadster.

46.    Defendants knew that its representations about these material facts were false when they were made. Defendants knew that Mr. Richards would probably rely upon Defendants' misrepresentations and/or non-disclosures and that they would cause damage.

47.    Defendants made these false and material misrepresentations intentionally and knowingly.

48.    Defendants made these false and material misrepresentations with the intent to mislead Mr. Richards.

49.    Defendants intended that Mr. Richards, as a potential purchaser of the Roadster and seller of the valuable 1980 Aston Martin, would probably rely on their representations, inducing him to enter into a contract to purchase the Roadster and transfer the 1980 Aston Martin to them.

50.    Defendants fraudulently induced Mr. Richards to enter into the contract to purchase the Roadster, by representing the Roadster's engine was "period correct," a "great car," and roadworthy. This was not mere puffery.

49. Mr. Richards did in fact rely on Defendants' misrepresentations in entering into the Agreement to purchase the Roadster, and such reliance was justified in the context of the relationship of the parties, and Mr. Papadopoulos' representations of expertise.

50. As a direct and proximate result of Defendants' intentional misrepresentations and/or non-disclosures as aforesaid, Mr. Richards has incurred substantial expense and has suffered substantial damages in an amount of $300,000.00, which amount will be proven at trial.

51. Plaintiff is also entitled to rescission and restitution.

52. Because Defendants acted with actual malice toward Mr. Richards or acted under circumstances amounting to a willful and wanton disregard of Mr. Richards' rights, Plaintiff is entitled to an award of punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows: (1) rescission of the sales contract, including the return to Plaintiff of the 1980 Aston Martin that he traded towards the Roadster; (2) compensatory damages in the amount of $300,000.00, which amount will be proven at trial; (3) punitive damages in the amount of not less than $350,000.00, which amount will be proven at trial; (4) payment of all costs associated with this action; (5) payment of reasonable attorneys' fees; (6) pre- and post-judgment interest as permitted by law; and (7) such other and further relief as this Court deems proper.

### *Count II*
### *(Constructive Fraud/Negligent Misrepresentation)*

53. The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

54. Defendants misrepresented and/or failed to disclose that the Roadster's engine was not "period correct," and that the Roadster was not roadworthy. The Defendants fraudulently

induced Mr. Richards to enter into the contract to purchase the Roadster, by representing the Roadster's engine was "period correct," a "great car," and roadworthy.

55.     By virtue of the relationship between Defendants and Mr. Richards, as well as Defendants' statutory responsibilities, the Defendants owed a duty of care to Mr. Richards. Mr. Richards reposed trust and confidence in the Defendants.

56.     Among the duties of Defendants was to make accurate representations and disclosures regarding the nature and condition of the Roadster.

57.     Defendants breached their duties to Mr. Richards negligently and/or with reckless disregard and/or innocently by making the aforementioned misrepresentations and non-disclosures, or alternatively, by representing that they had relevant expertise.

58.     Pursuant to Article 17, § 421(1) of Title IV of New York's Vehicle and Traffic Law, as persons engaged in the business of buying or selling motor vehicles, Defendants are "*presumed to have determined and to know the original vehicle identification numbers and special identification numbers on any motor vehicle…purchased or sold by [you], both at the time of purchase and sale.*"

59.     Pursuant to Article 17, § 421(4) of Title IV of New York's Vehicle and Traffic Law, "original identification number" means "*any number embossed, engraved, etched, affixed to a label, sticker or plate or similarly marked on any part of a motor vehicle, trailer or vehicle part which is assigned by the manufacturer for the purpose of identification of that particular motor vehicle, trailer or vehicle part and the location of which number is made available to the public.*"

12

60.     Pursuant to § 421(1), Defendants are presumed to have known the vehicle identification numbers in the Roadster sold to Mr. Richards by the Defendants, and particularly, that the Roadster contained:

a.      An inferior, older engine which its Type Numbers show could not have been manufactured in 1961 (*i.e.*, not period correct), with smaller oil pump gears, which is significantly less efficient, and significantly less valuable;

b.      A fraudulently stamped Timing Cover which sought to represent that the engine was "*period correct*." The presence of fraudulently stamped engine parts even further impacts the value of the Roadster; and,

c.      A case number which could not appear on a Model Year 1961 Porsche 356 engine, and which dates from mid-to-late 1959.

61.     As a direct and proximate result of Defendants' violation of the aforesaid statute, Plaintiff has incurred substantial damages.

62.     Defendants intended that Mr. Richards would rely on their representations regarding the Roadster, and/or their representations as to their expertise, inducing him to enter into the contract to purchase the Roadster. The Defendants knew that Mr. Richards would probably rely on their misrepresentations and/or non-disclosures and that they would cause damage.

62.     Mr. Richards did in fact rely on Defendants' misrepresentations in entering into the Agreement to purchase the Roadster, and such reliance was justified in the context of the relationship of the parties, and Mr. Papadopoulos' representations of expertise.

63.     As a result of Defendants' intentional misrepresentations and/or non-disclosures as aforesaid, Mr. Richards has suffered substantial damages in an amount of $300,000.00, which amount will be proven at trial.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows: (1) rescission of the sales contract, including the return of the 1980 Aston Martin which he traded towards the Roadster; (2) compensatory damages in the amount of not less than $300,000.00 which amount will be proven at trial; (3) payment of all costs associated with this action; (4) payment of reasonable attorneys' fees; (5) pre- and post-judgment interest as permitted by law; and (6) such other and further relief as this Court deems proper.

### Count III
### (Breach of Contract)

64.     The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

65.     In reliance on the representations of Defendants, which representations were incorporated as material provisions of the agreement between the parties whereby Mr. Richards purchased the Roadster in consideration of his 1980 Aston Martin (subsequently sold by the Defendants for approximately $219,500.00) and a further $60,000.00 cash (the "Agreement"), Mr. Richards paid good and valuable consideration for the Roadster.

66.     Defendants materially breached the contract as aforesaid, in that they did not deliver to Mr. Richards the vehicle that was promised, namely, a 1961 356B Roadster with a period correct engine, and which was in suitable condition and repair to render under normal use, satisfactory and adequate service upon the public highway at the time of delivery. Mr. Richards would not have entered into the Agreement, but for the misrepresentations of the Defendant as to the nature and condition of the Roadster.

67.      As a direct and proximate result of Defendants' breaches as aforesaid. Mr. Richards has suffered substantial damages in an amount of $300,000.00, which will be proven at trial.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in the amount of $300,000.00, which amount will be proven at trial; (2) payment of all costs associated with this action; (3) pre- and post-judgment interest as permitted by law; and (4) such other and further relief as this Court deems proper.

### *Count IV*
### (Violation of the Virginia Consumer Protection Act of 1977)

68.      The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

69.      The aforesaid acts and/or omissions of Defendants violate the Virginia Consumer Protection Act of 1977 (Va. Code Ann. § 59.1-200), enacted to promote fair and ethical standards of dealings between suppliers and the consuming public.

70.      Defendants violated the Act by, *inter alia*, misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; misrepresenting that goods or services have certain qualities, characteristics, ingredients, uses, or benefits; advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised; misrepresenting that repairs, alterations, modifications, or services have been performed or parts installed; and, using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction. (Va. Code Ann. § 59.1-200.5-6, 8, 10, 14).

71.    As a direct and proximate result of Defendants' breaches as aforesaid. Mr. Richards has suffered substantial damages in an amount of not less than $300,000.00, which will be proven at trial.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in the amount of not less than $300,000.00, which amount will be proven at trial; (2) payment of all costs associated with this action; (3) payment of reasonable attorneys' fees; (4) pre- and post-judgment interest as permitted by law; and (5) such other and further relief as this Court deems proper.

### *Count V*
### (Negligence *per se*)

72.    The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

73.    Pursuant to Article 17, § 421(2) of Title IV of New York's Vehicle and Traffic Law, "*any person engaged in the business of buying or selling motor vehicles, trailers, or parts thereof, who sells or offers for sale a motor vehicle, trailer, or part thereof, the original vehicle identification number or special identification number of which shall have been destroyed, removed, altered, defaced or so covered as to be effectually concealed, without having complied with regulations promulgated by the commissioner, shall be guilty of a class E felony.*"

74.    Pursuant to Article 17, § 421(4) of Title IV of New York's Vehicle and Traffic Law, "original identification number" means "*any number embossed, engraved, etched, affixed to a label, sticker or plate or similarly marked on any part of a motor vehicle, trailer or vehicle part which is assigned by the manufacturer for the purpose of identification of that particular motor vehicle, trailer or vehicle part and the location of which number is made available to the public.*"

75.     The sale of the Roadster to Mr. Richards with a fraudulently stamped Timing Cover violates § 421(4). The Defendants' violation of § 421(4) constitutes negligence *per se*.

76.     Section 421(2) was enacted to prevent the type of behavior that occurred, and to protect persons such as Plaintiff, and Defendants cannot offer an explanation as to the violation of such statute, thereby rendering Defendants negligent *per se* (*i.e.*, as a matter of law).

77.     As a direct and proximate result of Defendants' violation of the aforesaid statute, Plaintiff has suffered substantial damages, in an amount of 300,000.00, which shall be proven at trial.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in the amount of $300,000.00, which amount will be proven at trial; (2) payment of all costs associated with this action; (3) pre- and post-judgment interest as permitted by law; and (4) such other and further relief as this Court deems proper.

## JURY DEMAND

Plaintiff demands a trial by jury with respect to each of the claims alleged herein, to the maximum extent permitted by law,

Respectfully submitted,

ALLEN RICHARDS

*/s/ Peter C. Grenier*
BY:     Peter C. Grenier
        Grenier Law Group PLLC
        VSB # 50997
        1920 L Street, N.W.
        Suite 750
        Washington D.C. 20036
        Phone: (202) 768-9600
        Fax: (202) 768-9604

Dated: July 23, 2019